

IN THE
TENTH COURT OF APPEALS

No. 10-16-00129-CV

IN THE INTEREST OF C.C., J.C., JR., J.J.C., AND E.C., CHILDREN

From the County Court at Law
Bosque County, Texas
Trial Court No. CV14318

MEMORANDUM OPINION

In this parental-rights termination appeal, Appellant Nora, the mother of C.C., J.C., Jr., J.J.C. and E.C., raises eight issues. Appellant Andy, the father of E.C., raises two issues, and Appellant Jim, the father of J.C., Jr. and C.C., raises three issues.[1] Gus, the father of J.J.C., does not appeal.

After a jury trial, the trial court entered an order that terminated the parental rights of each appellant under Family Code subsections 161.001(b)(1)(D), (E), (F), (N), (O), and (P) and found that termination is in the children's best interest.

We begin with Nora's second issue, which asserts that the evidence is insufficient

---

[1] We will use the Department's fictitious names to protect the children's identities. *See* TEX. R. APP. P. 9.8(b)(2).

to support any of the termination grounds.[2]  In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements:  (1) one or more acts or omissions enumerated under subsection (b)(1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001(b)(1), (2) (West Supp. 2016); *Swate v. Swate,* 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other.  *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Swate,* 72 S.W.3d at 766.  "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Spangler v. Tex. Dep't of Prot. & Reg. Servs.,* 962 S.W.2d 253, 256 (Tex. App.—Waco 1998, no pet.).

If multiple predicate violations under section 161.001(b)(1) were found in the trial court, we will affirm based on any one ground because only one predicate violation under section 161.001(b)(1) is necessary to a termination judgment.  *In re T.N.F.,* 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.,* 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied).

A legal sufficiency review in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or

---

[2] Nora's second issue and her briefing on it do not specify whether she is challenging the legal or the factual sufficiency of the evidence, but because her brief repeatedly mentions "no evidence," we construe her issue as a challenge to the legal sufficiency of the evidence.

conviction about the truth of the matter on which the petitioner bears the burden of proof.

*In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (discussing legal sufficiency review).

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*Id.* at 266.

Deidre Rodriguez, a CPS investigator, testified that she first became involved with the family in May 2014. As a result of that case, the children went to live with Carla, their maternal grandmother. She explained that Carla had filed a petition to obtain custody of the children and sought to limit Nora's contact with the children to only supervised visits. Carla confirmed that when her petition was filed in 2014, she was requesting that Nora be allowed only supervised visits. Carla also testified that none of the fathers of the children was around then and that Jack, Nora's boyfriend, was acting as the children's father. She related that the children's fathers were not helping with or supporting them and that she did not know where the fathers were at the time. Nora confirmed that none of the fathers resided with her when Carla filed her private suit.

Rodriguez said that she later found out that Carla had allowed the children to return home to Nora. Rodriguez explained that the expectation was that Carla would require negative drug screens from Nora before allowing the children to return to her

because of the concern that Nora was using methamphetamine at the time. Because Carla had allowed the children to return home despite Nora's continued methamphetamine use, Rodriguez went to see the family on September 25, 2014. She said that Jack was living in the home at the time. Rodriguez interviewed the children, and three of them stated that they were living fulltime with Nora and Jack; E.C. was too young to be interviewed.

Rodriguez testified that in September 2014, Nora tested positive for methamphetamine but would not admit drug use despite the positive test. Roberta Stephens, a conservatorship supervisor with the Department, testified that the children were then removed because Carla had returned them to Nora without first making sure that Nora was drug-free.

Rodriguez related that Andy was incarcerated at the time of removal, and a special investigator went to speak with him. The Department had contact with Andy on October 29, 2014 but had not heard from him since, although he was provided with contact information. She stated that he was asked to keep in contact once he was released and to provide the Department with information on where he would be living. She said that he also would have received the "While your Child is In Care" booklet, "which kind of goes over the process and what his rights are." Ginger Lanmon, the CASA representative, sent Andy a letter in December 2014 providing Andy with her contact information and notice that the next court hearing was set for later that month.

Rodriguez testified that she was unable to find Gus and Jim at that time. Stephens testified that, to her knowledge, Andy and Jim did not even know the children and were

absent fathers.

Stephens testified that Nora was to complete the following services: Notify the Department of change in address or phone numbers; obtain and maintain stable and safe housing; obtain and maintain employment to meet the financial needs of the children; attend and participate in parenting classes; complete a psychosocial assessment and follow all recommendations; attend and complete therapy; complete a drug and alcohol assessment and follow recommendations; attend visits with the children; and comply with random drug testing prior to visits. Sonia Honea, a CPS caseworker, testified that she had reviewed the service plan with Nora several times.

Stephens testified that the goal in the case started as family reunification and that an extension order was done to give Nora additional time to work services. She explained that Nora had gone to rehabilitation, and the hope at the time the extension was sought was that she could remain sober and complete services.

Stephens said that Nora submitted to a drug and alcohol assessment on January 27, 2015, which recommended that she attend inpatient rehabilitation. Despite Nora's eventually completing rehabilitation, Stephens testified that Nora had failed to complete the drug and alcohol recommendations because she is still using drugs. Honea testified that Nora had failed to be able to drug test clean and to show sobriety. Honea agreed that Nora attempted to maintain sobriety for about two months after she completed rehabilitation, but she explained that, as a result of her inability to remain drug-free, Nora had only five visits with the children during the year and a half the case went on.

Stephens stated that Nora had not maintained stable employment throughout the case, and while she was aware that Nora was employed at the time of trial, Stephens did not know where. Stephens also testified that Nora had not provided support for the children throughout the case in accordance with her ability, although she may have given money directly for the benefit of the children recently. Honea testified that at the end of February, Nora provided a $100 money order for the children's foster mother and the children, as well as $35 for field trip fees for C.C.

Honea said that Nora failed to complete protective parenting classes and did not have a safe and stable residence for the children. Stephens testified that Nora took "some" parenting classes, including some classes while in inpatient rehabilitation, but Honea testified that the parenting class that Nora completed while in rehabilitation was not the class required by her service plan. Stephens said that Nora appeared "sporadically" for her protective parenting classes. Stephens testified that although she had received several notifications from Nora of address changes, there were times that Department employees would attempt visits, but it appeared that no one was living at the provided address.

While Stephens agreed that Nora had completed the psychosocial evaluation and also the psychological evaluation that was recommended by the psychosocial evaluation, Honea testified that there were concerns after Nora completed the psychosocial evaluation because "it did say that she was not a suitable parental resource and there was [*sic*] concerns about her visiting or parenting under the influence and that she would need to show some long-term sobriety." Honea said that Nora had not demonstrated long-

term sobriety. Honea testified that Nora told her that she voluntarily went to MHMR and that she would be attending therapy, aftercare, and drug counseling there, but when Honea called to check on those services in February 2016, Nora was not attending.

In November 2015, Nora completed an assessment with Dr. James Shinder, a psychologist. In his report, Dr. Shinder pointed out that he had previously completed assessments for Nora and that many concerns remained, such as drug use, domestic violence, and parental irresponsibility. Dr. Shinder noted that her test results suggest "a substantial level of social alienation" and that it was likely that Nora would be "unable to consistently recognize, and/or take into account the needs and feelings of others." He opined that she was also likely to be "excessively focused on feelings of anger and hostility." Dr. Shinder was also concerned about her limited self-control, and "an overwhelming level of problem with regard to anger, hostility, and aggression." He noted that her anxiety levels were at the extreme end of the scale and that she was likely to be paranoid and "easily angered by very minor provocation."

Dr. Shinder's report noted that Nora believes that others are at fault for her problems and that the results "reflect a perception of herself as the innocent victim of various circumstances. She views her problems and failures as being due to either the malicious intent of others, or unavoidable misfortune." He also noted that Nora has "some obvious manipulative tendencies, especially in regard to the assumption of responsibility." Dr. Shinder stated that Nora had the pronounced tendency to "rationalize various areas of misbehavior or irresponsibility" but ultimately determined that Nora could be a "potentially suitable independent parental resource." He went on

to say that Nora needed to participate in an anger management program "to address the severity of problem she has in regard to anger, hostility, and aggression." He also stated that long-term participation in NA or AA was essential.

Honea agreed that Dr. Shinder's psychological evaluation was in November 2015 and that one of the recommendations was for Nora to remain sober, but by Christmas, Nora had relapsed. Lanmon testified that she agreed with Dr. Shinder's assessment that Nora has "some obvious manipulative tendencies, especially in regard to the assumption of responsibility." Honea agreed that Nora has demonstrated a problem by manipulating others and refusing to take responsibility for her actions.

In her testimony, Nora admitted that she has had a problem with methamphetamine for ten years, since she was 17 years old. Honea similarly testified that Nora told her she had a long history of drug usage, beginning when she was a teenager.

Stephens testified that drug testing of Nora was ordered by the court, and she testified to the following results:

- October 6, 2014: positive for amphetamines and methamphetamines.
- November 10, 2014: positive for amphetamines and methamphetamines.
- November 24, 2014: positive for marijuana.
- December 17, 2014: negative for all substances.
- December 29, 2014: positive for marijuana, methamphetamines, and amphetamines.
- February 5, 2015: positive for marijuana, methamphetamines, and amphetamines.
- February 20, 2015: positive for amphetamines and methamphetamines.
- April 10, 2015: negative for all substances.
- April 14, 2015: positive for marijuana.
- June 18, 2015: positive for methamphetamines and amphetamines.
- July 22, 2015: negative for all substances.
- August 13, 2015: negative for all substances.

- October 8, 2015: positive for methamphetamines.
- October 20, 2015: negative for all substances.
- October 30, 2015: negative for all substances.
- November 5, 2015: positive for methamphetamines and amphetamines.
- December 18, 2015: negative for all substances.
- February 2, 2016: positive for methamphetamines and amphetamines.
- February 11, 2016: negative for all substances.

Nora did not deny that she had tested positive for drugs during the case; she testified "that's what the test results are saying," and when asked if she denied what the test results were, she responded "No ma'am. They are right there. Why am I going to deny it?" Nora also admitted she was positive for methamphetamine in February 2016.

Lanmon testified that there were times when Nora was asked to drug test during the case, but she refused. She related that at the last court hearing, Nora was "angry, disruptive and defiant," was "on drugs," and refused a drug test. She stated that Nora became upset because of a request to take a drug test.

Honea agreed that for approximately the first year of the case, her relationship with Nora was "hard" because Nora was evading drug tests and providing excuses for not meeting up. Honea stated that after that year, Nora became "a little more forthcoming" and their relationship improved. She said that at that time, Nora admitted to being on methamphetamine for ten years and that she was unable to get off the drug and maintain sobriety. Honea testified that because Nora had trouble getting to the testing facilities, she would go to her to make it easier to complete the drug tests. Honea stated that after Nora relapsed, she became evasive again.

Honea testified that one of the alcohol assessment's recommendations for Nora was that she enter inpatient rehabilitation. Stephens testified that Nora first entered

rehabilitation in December 2014 but left after only four days. Stephens testified that Nora then entered inpatient treatment in March 2015 and stayed for eleven or twelve days. Nora entered rehabilitation on June 26, 2015 and was successfully discharged on July 19, 2015.

Nora testified that the reason she left rehabilitation after a few days the first time she entered was because she knew she would not visit with the children there and she felt like she "wasn't getting anywhere" with the Department. She said that she left rehabilitation the second time for the same reason. Nora acknowledged that the reason to go to rehabilitation was to get better, but "the most important reason was I wanted to see my kids already and I could not do it on my own out here, so that's the reason why."

Honea recalled that after Nora left rehabilitation in July 2015, she requested to be drug tested weekly, but after testing positive on a hair-follicle test, Nora admitted to relapsing and thereafter started testing positive or evading drug screens. Nora explained that she relapsed on drugs because the case was "emotionally upsetting" for her. When asked what she believed the effect on the children is, she replied: "Emotionally it has done them a lot, yes. Taking them away from me, yes, because while they were with me, they were not emotionally hurt."

Stephens confirmed that it was ordered that Nora pass a drug screen before having supervised visits with the children, and if she failed a screen, she then had to have two clean screens before visits start again. Stephens testified that the first visit between Nora and the children did not occur until July 28, 2015; all previous visits were cancelled due to positive drug screens, with the exception of the July 13, 2015 visit, which was cancelled

because Nora was in rehabilitation. Stephens stated that Nora did ask to see the children during that time, but Nora was aware that she was required to have two clean drug screens before that could take place. Stephens testified that Nora attended all scheduled visits. Honea opined that it was good that Nora was not able to see the children after failed drug screens because Nora's state of mind would have been harmful to the children. Honea testified that Nora was appropriate with the children during visits and that she was engaged with them. She agreed that the visits were a "positive aspect to the case."

Stephens testified that a parent's drug use has an "everlasting effect" on children. She explained that if a parent is using drugs, she cannot properly care for a child, and if a child is removed, that is devastating for that child. Carla agreed that Nora's continued drug use was not good for the children and that she needed to "keep pushing forward to continue to seek help."

Stephens testified that Andy and Jim had not worked services in the case, paid child support, nor ever contacted the Department "[a]s to how they could possibly get these kids back." Also, they had never provided potential family placements.

Nora testified that Jim resided with her until C.C. was about two years old and that she was still married to Jim at the time of trial. She stated that Jim lived in San Antonio for a little while and then he was deported to Mexico, where she believed he was at the time of trial.

Honea testified that Andy had been incarcerated sporadically throughout the case, including when the Department became involved in September 2014. Honea confirmed

that Andy had been in and out of incarceration, but she did not know his dates of incarceration. Honea said that the Department had difficulties locating Andy throughout the case, and Stephens testified that Nora told her that Andy did not have contact with the children before being incarcerated.

Honea stated that when Andy was released from incarceration during the case, she attempted to locate him. She said that during the time he was released, he did not contact her to attempt to work services, send support to the children, or "attempt to take parenting classes, anger management, any of the things that are required under the service plan." Honea explained that he had not worked his services. Andy admitted he failed to work services during the times he was not in jail during the case.

Honea testified that Jim also had not worked services. She related that he was "possibly in Mexico" but he had not contacted her at all and had paid no support.

Honea agreed that all of the fathers "left these children with [Nora] in circumstances that would endanger their health and well-being." Honea agreed that Andy and Jack were familiar with where the children lived, and Jack was familiar with the situation concerning methamphetamine abuse. Honea testified that Andy left the children in an endangering environment by leaving them with Nora. She said that she knew that Andy had not been an active parent for the children.

Nora testified that Andy was incarcerated at the time of trial. Nora said that Andy had been incarcerated from time to time and had contacted her through letters and phone calls during his incarceration.

Andy admitted that he was in jail for possession of a controlled substance because he had problems with methamphetamine, but he denied using methamphetamine and agreed that he had heard Nora also had a drug problem. He denied that he knew the children would be endangered when he went into the penitentiary. Andy denied ever using drugs with Nora.

Nora stated it had been approximately a year since she was with Andy, after which she went back to Jack. She testified that Andy knew about her pregnancy with E.C. and was understanding about Jack being the father figure. Nora confirmed that Andy would ask about E.C. and had sent her money in the past.

Stephens testified that, initially, all four children were placed with their great-grandparents. Stephens said that Nora was trying to contact the children outside of the parameters of the court order and that the Department discovered that when the children were staying with the great-grandparents, Nora was staying overnight and sleeping in the same bed as E.C. Stephens testified that this was one of the reasons that the children were removed from that home.

Lanmon testified that when the children were first removed, they behaved as if they had never been disciplined and did not understand rules. She said that the oldest child told her that he "was the boss" and tried to "boss the younger children. He was physically aggressive with his grandparents, as well as with his younger siblings, who were at that time four and five. I felt that the older ones were a danger to the grandparents and to the younger children."

Honea testified that when the children were placed with their great-grandparents, Nora attempted to disrupt placement by telling the children that they did not have to mind their great-grandparents. The children also reported that Nora would appear at church and visit with the children without authorization. Lanmon also testified that Nora attempted to undermine the great-grandparents by telling the children that C.C. was in charge, not the great-grandparents, and they did not have to mind them.

Nora admitted that when the children were first placed with the great-grandparents, she was not emotionally supportive. She denied telling the children to disrespect their great-grandparents. Nora claimed that when the children were placed with the great-grandparents, she bought the children shoes and clothes.

Stephens stated that J.C., Jr. and C.C. had to be moved to foster care because of behavior issues and were then moved to the home of Darlene, their great-aunt, in December 2015. Lanmon confirmed that the older boys had to be removed because they were hitting the great-grandparents. Stephens stated that in February 2016, E.C. and J.J.C. made an outcry against their great-grandparents, so they were also moved to Darlene's house.

Stephens testified that although the children were doing well in Darlene's home initially, there had been behavior problems recently, including J.C., Jr. pushing Darlene and their grades dropping. Stephens said that Nora had contact with the children on Easter by phone and that the children told Stephens that they also saw Carla on that day. Lanmon related that before they talked to Nora on Easter Sunday, the children desired to remain with their great-aunt. She testified that the children were taken to a family Easter

egg hunt where an uncle, who was not authorized to supervise phone calls, allowed them to call Nora. The children's uncle testified at trial and confirmed that he supervised this phone call. Lanmon testified that when she discussed the phone call with the children, each of them immediately asked if they were going to be separated from their other siblings. She stated that after Easter, the children's attitude also changed at Darlene's home, and they have been "very angry, very upset." She testified that the children's biggest fear is to be split up, and she felt someone had threatened them with that happening.

Stephens testified that Darlene had relayed that the other family members were calling and harassing her and upsetting the children. She confirmed that "harassment and overall attitude" has been a problem throughout the case. Nora denied repeatedly texting and harassing Darlene.

Honea testified that the family in general had harassed Darlene and caused her "a lot of grief," but she was unsure if Nora had participated in this harassment. She said that the family blamed Darlene for the children being in care and agreed that Darlene has been under "tremendous stress" because of the harassment from Nora and Carla. Honea also related that the boys had cell phones they would use to text Nora. Nora admitted that the Department expressed concern to her about her hostility at the beginning of the case, and they told her she was "making problems" by constantly calling the children. Nora claimed she was simply trying to keep the children updated. When asked what she meant by saying she would text or contact the children often when she "could get away with it," Nora responded that "any time that I could talk to my kids whether it is getting

caught or not getting caught, to me I think is okay, because it is talking with my children." Nora then claimed that it was the children who called her, and that she did not call the children.

Lanmon testified that she has visited the children in Darlene's home and that at first, the placement was working out well; the children were doing chores and doing well in school for the first five to six weeks. Lanmon, however, went on to say that Nora had disrupted the placement with Darlene and attempted to undermine the placement. Lanmon explained that Nora "constantly" texted Darlene with endless requests for information.

Lanmon related that Nora was invited by the family to attend a birthday party for C.C., but while there, she was sullen. During the party, Nora sat with J.C., Jr., as he had been disciplined, and afterwards, J.C., Jr. exhibited behavioral problems. Lanmon agreed that unsupervised phone calls were an ongoing problem in this case. She stated that the children would use friends' phones to call their mother and later used their own phones to contact her by text and social media. Lanmon testified that some of the conversations between Nora and the children were inappropriate.

Lanmon related that the month before the final hearing, C.C. and J.C., Jr. "were very angry. I have a text message on my phone here that says that [C.C.] told his mother, sent the text to his mother, that he didn't trust her, didn't want her going through his things. They said that they didn't want to be with their mother, they would prefer to go to the ones that they said yesterday were their second choice." Lanmon stated that it was not in the children's best interest to be forced to come to court to testify to what is not

what they actually want, and stated: "I think it was traumatic for the children to have had to do that and for them to have to come to court to speak about something that they didn't really believe was -- wasn't age appropriate for children their age." She explained she believed the children felt pressured, which is not good for them.

Lanmon testified that C.C. and J.C., Jr. told her that Nora allowed them to smoke marijuana; she said that C.C. "told [her] he rolled a big blunt that they smoked." Lanmon stated that C.C. would have been ten years old at that time and that J.C., Jr. would have been nine. Lanmon further said that the children told Darlene that they had found drug paraphernalia in Nora's home.

C.C. testified that he was 12 years old at the time of trial. He said that the "most important" thing was for him to be able to stay with his siblings. He stated that he loves Darlene and enjoys living with her and that his siblings "love" living with Darlene. C.C. testified that his first choice of where to live would be with Nora, and his second choice would be to live with his grandmother. He said that he wanted to return to Nora because he loves her. C.C. denied ever seeing drugs in his home or seeing Nora use drugs, and he denied telling Darlene that he found drug pipes belonging to Nora at his house. C.C. stated that Andy did not reside with him, his siblings, and Nora; he said that they had seen him in the past but had not seen him in a long time.

J.C., Jr. testified that he was eleven years old. He said that it was the "most important" thing to remain with his siblings. J.C., Jr. stated that he loved Darlene and likes living with her. J.C., Jr. said his first choice was to be placed with Nora, and his second was with his uncle named Otto.

J.C., Jr. testified that he told Darlene that he found pipes in Nora's home but stated that they belonged to her boyfriend. J.C., Jr. denied that he had told Lanmon that he and his brother smoked marijuana with Nora, and he denied seeing drugs in the home or seeing Nora use drugs. J.C., Jr. testified he had met Jim when he was a child and could not remember if he had ever resided with him.

Honea testified that Jack was living with Nora after the children's removal and that his reputation in the community is "very well-known for drug use, suspected of selling drugs. He's very violent. He's very controlling." She said that there "was quite a bit of domestic violence" between Jack and Nora and that this violence occurred while the children were in the home. Honea stated that Jack refused to drug test, do services, or speak with her, and he also refused to submit to paternity testing, despite a court order.

Toward the end of the case, Nora told Honea she was having a hard time severing her relationship with Jack because he was her main support system. Nora further told Honea that she was concerned about whether she would be able to care for the children if they were returned home and told Honea she was struggling to care for herself. Jill, Nora's sister-in-law, agreed that Jack has a well-known reputation for methamphetamine use. Jill also agreed that she believed there was domestic violence between Jack and Nora, and Nora admitted she had made "bad choices" in her paramours.

Nora testified that at the time of trial, she was living alone and working at a motel. Stephens said that Nora is still residing in the same home that the children were removed from. She stated they had received reports that Nora is still living with Jack. Nora testified that two months before trial, she filed criminal trespass charges against

Jack and stated the police had been to her house three times to escort him from the property.

Honea testified that she went to visit a home Nora had gotten in February 2016, and although Nora had done what she could with the residence, there were broken windows and no running water, and it was not suitable for the children. Honea said that the last time she saw Nora's residence, there were some improvements, and Nora testified that she now had running water at the residence.

Honea stated that she was able to verify that Nora is working for a motel, although Nora never provided pay stubs. Nora testified she worked at the Glen Rose Hotel and had been there for four months, making $8 an hour and working full time.

Nora stated she had never harmed the children, claiming instead that she was "too overprotective." Nora stated that "other than my drug test being positive, there has been no, in my eyes and in the proof and evidence, there's been no harm done to my children physically or the way they were taken care of from bathing and eating and living."

Nora related that she was told in rehabilitation that "it is very common to relapse and it is going to take more than a couple of tries and especially after battling, you know, an addiction you've had many years, it is not just going to happen in a small time frame."

Nora wrote the judge a letter that was admitted into evidence. In the letter, she pointed out that she had a drug history but boasted that, despite her substance abuse, previous Department cases had been ruled out or were ruled "unable to determine." She admitted that the "only thing" was her substance abuse and pointed out that the children were healthy at the time of removal.

When asked what she was doing to remain sober, Nora responded that she was trying to "take day by day" and to stay busy. Nora conveyed that her "hopes and dreams" for the children included wanting "them to succeed and to be happy and I want to be part of their life."

Stephens testified that Nora had never taken responsibility for her actions. Stephens said that after talking to Nora, it was apparent that she believed the situation was the Department's fault and she did not believe "any of this has to do with her." Stephens stated that part of the service plan is for Nora to take responsibility for her methamphetamine use, but she had failed to do so.

Stephens further explained that there are times when Nora is "very upset, hostile," she would sometimes refuse to work with the Department, and she will be evasive and have excuses on why she will not meet. Stephens testified that during the case, Nora was held in contempt for continuing to speak out during a hearing and refusing to listen to instructions.

Stephens explained that without termination, the children would not have permanency, as they could not be adopted, and would be "stuck in foster care until they are 18 years old." She stated that the children "need permanency. They need to know where they are going to be raised and stay and taken care of forever." She clarified that if parental rights are terminated, the children could be adopted and have a forever home. She said that it is in the children's best interest to have permanency.

Honea stated that Nora had "not taken responsibility at all" and that during the past few months, she was calling the family placements and trying to disrupt those placements. Honea opined that Nora had not taken responsibility for her role in the case.

Lanmon agreed that "the environment that [Nora] and that these fathers left these children in was a danger to their health and safety." Lanmon testified that the children should not be returned to any of the parents. Lanmon testified she believed it was in the children's best interest to have no visits with Nora if she was not testing clean.

Stephens testified that because Andy had never been in the children's lives, it would not make much of a difference to them if his parental rights were terminated. She stated that as far as she knew, the children did not know who he was. She testified that it was the same for Jim, as none of the fathers had been around the children.

Family Code subsection 161.001(b)(1)(O) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence "that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Nora argues that there was no evidence of what services she was required to complete, that she completed some of her services, and that the children were not removed for abuse or neglect under Chapter 262.

Stephens testified that Nora was to complete the following services: Notify the Department of change in address or phone numbers; obtain and maintain stable and safe housing; obtain and maintain employment to meet the financial needs of the children; attend and participate in parenting classes; complete a psychosocial assessment and follow all recommendations; attend and complete therapy; complete a drug and alcohol assessment and follow recommendations; attend visits with the children; and comply with random drug testing prior to visits. Honea testified that she had reviewed the service plan with Nora several times.

The Family Code does not provide for substantial compliance with a court-ordered service plan under subsection 161.001(b)(1)(O), nor does subsection 161.001(b)(1)(O) allow for excuses for failure to complete the service plan. *In re D.D.*, No. 10-13-00223-CV, 2013 WL 6923980, at *2 (Tex. App.—Waco Dec. 27, 2013, no pet.) (mem. op.); *In re R.N.W.*, No. 10-11-00441-CV, 2012 WL 2053857, at *2 (Tex. App.—Waco June 6, 2012, no pet.) (mem. op.); *see also In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Stephens testified to the requirements of the service plan. Nora presents no authority that would require that the service plan itself be introduced as an exhibit at the final hearing.

Stephens testified that although Nora completed the drug and alcohol assessment in January 2015, Nora failed to complete the recommendations of the assessment, as she was still using drugs. Honea also had difficulty getting Nora to consistently submit to drug tests and described her behavior as "evasive." Honea testified that Nora failed to

complete protective parenting classes and did not have a safe and stable home for the children.

Nora argues that she completed some of her services, but she freely admits that she failed to complete parenting classes and anger management. Nora makes the excuse that she had transportation issues, but excuses are not a defense to failure to complete a service plan. And although Nora claims that she had a stable home ready for the children, the jury was free to weigh her claims against Honea's testimony that the house was unsuitable and to determine that Nora had failed to comply with that element of the plan.

The supreme court recently held:

> So while subsection O requires removal under chapter 262 for abuse or neglect, those words are used broadly. Consistent with chapter 262's removal standards, "abuse or neglect of the child" necessarily includes the risks or threats of the environment in which the child is placed. Part of that calculus includes the harm suffered or the danger faced by other children under the parent's care. If a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been "remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child."

*In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). The supreme court plainly held that subsection 161.001(b)(1)(O) can be satisfied by *risk* of abuse or neglect, which would apply to the removal of Nora's children. *Id.* at 246-48.

Here, as in *E.C.R.*, the Department's evidence in support of removal included an affidavit showing that the Department received a referral on September 25, 2014 that J.C, Jr. and C.C. reported at school that Nora had been arrested and that Jack had kicked them out of the residence. The affidavit also reveals that Nora had tested positive for methamphetamine on October 1, 2014 and that the children had been exposed to

domestic violence. The affidavit states that J.J.C. revealed that he had seen Jack smoking weed, Jack pushing Nora, and Nora hitting Jack with a chair.

Testimony at trial also demonstrated that the children were removed for abuse or neglect. Rodriguez testified that in 2014, Carla filed for conservatorship of the children based on Nora's ongoing methamphetamine abuse. Rodriguez discovered that Carla had allowed the children to return to Nora, despite Carla's knowledge of Nora's continuing methamphetamine abuse. Rodriguez went to see the family on September 25, 2014 based on these reports, and she testified that the three oldest children told her that they were living with Jack and Nora. Rodriguez testified that Nora tested positive for methamphetamine at the time of removal, and J.C., Jr. later told Darlene that he had found Jack's drug pipes in Nora's home. Nora freely admitted at trial that the drug test results were accurate and that she had a ten-year history of methamphetamine abuse. Lanmon testified that C.C. and J.C., Jr. had told her in the past that they had smoked marijuana with Nora and that C.C. "told [her] he rolled a big blunt that they smoked." Lanmon agreed that the environment provided to the children by Nora was "a danger to their health and safety."

Stephens testified that a parent's drug use has an "everlasting effect" on children. She explained that if a parent is using drugs, she cannot properly care for a child, and that a child's removal can be devastating for that child. Carla agreed that it was not good for the children that Nora continued to use drugs and that she needed to "keep pushing forward to continue to seek help."

Honea testified that Jack's reputation in the community is "very well known for drug use, suspected of selling drugs. He's very violent. He's very controlling." She also said that there "was quite a bit of domestic violence" between Jack and Nora and that this occurred while the children were in the home. Jill similarly testified that Jack has a reputation for methamphetamine use and that she believed there was domestic violence between Jack and Nora.

The Temporary Order Following Adversary Hearing entered on October 27, 2014 contains the following finding:

> Having examined and reviewed the Department's pleadings and the sworn affidavit accompanying the petition and based upon the facts contained therein and the evidence presented to this Court at the hearing conducted on this date, the Court finds there is sufficient evidence to satisfy a person of ordinary prudence and caution that: (1) there was a danger to the physical health or safety of the children which was caused by an act or failure to act of the person entitled to possession. The Court further finds that it is contrary to the welfare of [the children] to remain in the home, and; (2) the urgent need for protection required the immediate removal of [the children] and reasonable efforts consistent with the circumstances and providing for the safety of [the children] were made to eliminate or prevent the removal of [the children]; and (3) reasonable efforts have been made to enable [the children] to return home, but there is a substantial risk of a continuing danger if [the children] are returned home.

Nora does not challenge the temporary order on appeal.

The children were removed because of a risk of abuse or neglect as contemplated by Family Code subsection 161.001(b)(1)(O). The jury was free to consider Rodriguez's direct testimony that Nora was using methamphetamine, in addition to Nora's own admission of a long history of drug use, and could have determined that Nora endangered the children's safety such that return to Nora would be inappropriate. In

addition, the trial testimony of Honea and Jill demonstrated that Nora exposed the children to Jack, who was a dangerous person, used methamphetamine, and exposed the children to domestic violence. The jury was free to determine that the children were removed for risk of abuse or neglect, even though the children did not sustain physical injury. *See E.C.R.*, 402 S.W.3d at 248. As in *E.C.R.*, the affidavit and the unchallenged findings in the temporary order further support that the children were removed for abuse or neglect within the meaning of subsection (O). *See id*. at 247-49.

On Nora's legal sufficiency complaint on the subsection 161.001(b)(1)(O) ground, viewing all the evidence in the light most favorable to the jury's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that Nora failed to comply with the provisions of a court order specifically establishing the actions necessary for her to obtain return of her children as a result of the children's removal for abuse or neglect. Accordingly, the evidence is legally sufficient on the subsection 161.001(b)(1)(O) ground, and we overrule issue two. We need not address Nora's sufficiency complaints in issue two on the other predicate grounds for termination.

In issue six, Nora alleges that the trial court erred by submitting a broad-form jury charge on the six termination grounds against Nora and that the charge contains *Casteel* error because of typographical errors in one of the grounds. Nora objected to the broad-form submission in the trial court. Last year we noted that the supreme court has held that a trial court does not abuse its discretion by submitting a broad-form jury charge in a termination case. *In re E.M.*, 494 S.W.3d 209, 229 (Tex. App.—Waco 2015, pet. denied) (citing *Tex. Dep't Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g)). We

thus conclude that the trial court did not abuse its discretion by submitting a broad-form jury charge on the six termination grounds. As for the typographical errors that allegedly create *Casteel* error, Nora did not object to the charge on this basis and thus has not preserved this complaint for appellate review. We overrule issue six.

In issue three, Nora asserts that the evidence is legally insufficient to support the jury's finding that termination is in the children's best interest.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.* The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't Prot. & Reg. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable, permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage).

Evidence of the parental misconduct leading to the removal and subsequent termination should be considered when reviewing the best interest of the child. *In re C.C.*, No. 13-07-00541-CV, 2009 WL 866822, at *10 (Tex. App.—Corpus Christi Apr. 2, 2009, pet. denied) (mem. op.). A parent's history, admissions, drug abuse, and inability to maintain a lifestyle free from arrests and incarcerations are relevant to the best interest determination. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). A parent's engaging in criminal conduct endangers the emotional well-being of a child because of the parent's resulting incarceration. *See Karl v. Tex. Dep't Prot. & Reg. Servs.*, No. 03-03-00655-CV, 2004 WL 1573162, at *2-3 (Tex. App.—Austin Jul. 15, 2004, no pet.) (mem. op.); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("[C]onduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.").

A factfinder may infer that a parent's failure to complete her court-ordered services, and in particular drug-treatment services, indicate a continuing danger to the children. *See In re B.A.*, No. 04-13-00246-CV, 2013 WL 4679089, at *1 (Tex. App.—San Antonio Aug. 28, 2013, no pet.) (mem. op.) (parent's failure to complete services directly

related to reasons for child's removal indicates continued danger to child). Further, a factfinder may infer from evidence of on-going drug abuse that a parent is unable to provide a safe environment for the children, cannot meet the children's present and future physical and emotional needs, and that her continuing care of the children presents a present and future danger to their safety. *See In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.— Waco 2008, no pet.) (parent's illegal drug use is relevant to determining present and future risk to child's physical and emotional well-being); *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (noting that parent's continued drug use poses emotional and physical danger to child now and in future). Also, a factfinder can infer from a parent's failure to take the initiative to avail herself of the programs offered to her by the Department that the parent "did not have the ability to motivate herself to seek out available resources needed…now or in the future." *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.).

A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.— Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). A factfinder may also consider the consequences of its failure to terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur. *D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ),

*disapproved of on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39. The goal of establishing a stable, permanent home for children is a compelling state interest. *Dupree,* 907 S.W.2d at 87.

At the time of trial, the children were living with Darlene, their great-aunt. Honea testified that if parental rights were terminated, the children could be adopted and have permanency.

Considering all the evidence in relation to the *Holley* factors in the light most favorable to the jury's best-interest finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination of Nora's parental rights was in the children's best interest. The evidence is legally sufficient on the best-interest finding, and we overrule Nora's third issue.

We now turn to Nora's first issue, which asserts that the trial court abused its discretion in admitting Nora's drug test results because they were not properly authenticated as business records. *See* TEX. R. EVID. 803(6); 902(10).

A party must timely object in the trial court to preserve a complaint for appellate review. TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a)(1). The complaint on appeal must comport with the one presented in the trial court. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex. 1997); *Wohlfahrt v. Holloway,* 172 S.W.3d 630, 639-40 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (to preserve error, party's argument on appeal must comport with argument in trial court.).

At trial, Nora's objection to the drug test results was that no foundation had been laid for the scientific reliability of the testing devices and their maintenance and no

testimony about proper test administration. Because Nora's complaint on appeal does not comport with her objection in the trial court, it is not preserved for appellate review. Issue one is overruled.

Nora's fourth issue asserts that the trial court erred in naming the Department as the children's sole managing conservator because relatives were willing to be the children's sole managing conservator. We agree with the Department that Nora lacks standing to raise this argument for those relatives and thus overrule issue four. *See E.A. v. Tex. Dep't Fam. & Prot. Servs.,* No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, no pet.) (mem. op.); *In re L.K.,* No. 12-11-00169-CV, 2012 WL 6674417, at *7 (Tex. App.—Tyler Dec. 20, 2012, pet. denied) (mem. op.) ("An appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others.").

In issue five, Nora complains that, because the trial court had previously granted her motion to exclude evidence regarding her arrest history that did not result in charges or convictions, the trial court erred by admitting evidence that Nora had been held in contempt at a prior hearing. At trial, Nora's attorney objected to the testimony that Nora was held in contempt at a permanency hearing, even though no testimony about any charges or arrest was introduced at trial. Assuming that the admission of Nora's contempt was error, the error was harmless because testimony about the contempt was admitted four other times, without objection, including Nora's own admission that she had been held in contempt. Therefore, Nora cannot show harm—that the alleged error resulted in the rendition of an improper judgment. TEX. R. APP. P. 44.1; *see In re D.P.,* No.

10-09-00271-CV, 2010 WL 654525, at *2 (Tex. App.—Waco Feb. 24, 2010, no pet.) (mem. op.) ("If wrongly admitted evidence is merely cumulative of other evidence that was properly admitted, the error is harmless."). Issue five is overruled.

Nora's seventh issue and Andy and Jim's third issue complain that the trial court erred in answering a question from the jury. Nora argues that the initial response from the judge was incorrect, and the jury should have been provided a correct answer. Andy and Jim allege that their constitutional rights were violated because the original answer was incorrect and because the corrected answer was insufficient to "cleanse" the incorrect response.

The jury submitted a written question to the trial court during their deliberations that asked: "If terminating rights[,] are rights of all relatives terminated?" The trial court's original response was: "Only the rights of the parties to this suit are involved. Follow the charge." After concerns were raised, the trial court proposed to add the following to the original note: "To correct my previous ruling on your question, other parties may be affected." Counsel for Nora and for Andy and Jim agreed with the corrected note and did not object to it, and counsel for Andy and Jim did not make the constitutional-right objection being raised on appeal for the first time. We thus overrule Nora's seventh issue and Andy and Jim's third issue because they did not preserve their complaints for appellate review. TEX. R. APP. P. 33.1(a); *see In re C.L.B.*, No. 10-13-00203-CV, 2014 WL 702798, at *8 (Tex. App.—Waco Feb. 20, 2014, no pet.) (mem. op.) (stating that constitutional violations must be raised in the trial court for them to be preserved for appellate review).

In her eighth (and final) issue, Nora alleges that cumulative error warrants reversal. We overrule issue eight because we found no errors and because we found the assumed error in issue five to be harmless.

We next turn to Andy and Jim's first issue, which asserts that they were not subject to the trial court's jurisdiction because service on them by publication was invalid because it was not supported by motion and affidavit establishing due diligence. The Department replies that Andy and Jim made general appearances through their attorney such that the trial court had jurisdiction over them.

Generally, by appearing before the court in person or by attorney, a defendant indicates that he submits to the court's jurisdiction because such an appearance has the "same force and effect as if the citation had been duly issued and served as provided by law." TEX. R. CIV. P. 120; *see Mays v. Perkins,* 927 S.W.2d 222, 225 (Tex. App.—Houston [1st Dist.] 1996, no writ). Any one of three categories of activities constitute a general appearance: (1) the defendant invokes the judgment of the court on any question other than the court's jurisdiction; (2) the defendant recognizes by its acts that an action is properly pending; or (3) the defendant seeks affirmative action from the court. *See Exito Elecs. Co. v. Trejo,* 142 S.W.3d 302, 304 (Tex. 2004). Lack of personal jurisdiction may be waived. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n.14, 105 S.Ct. 2174, 2182 n.14, 85 L.Ed.2d 528 (1985) ("[T]he personal jurisdiction requirement is a waivable right."). To determine whether a party has made a voluntary appearance, the court must examine the nature and quality of the party's activities in the case. *Bradford v. Bradford,* 971 S.W.2d 595, 597 (Tex. App.—Dallas 1998, no pet). A party who examines witnesses or offers

testimony has made a general appearance. *See Wichita County v. Robinson,* 276 S.W.2d 509, 512 (Tex. 1954). A party who voluntarily continues to participate in trial and presents a defense and does not seek to withdraw from such participation nor otherwise raise a question as to the court's authority to exercise its jurisdiction over the case, has entered an appearance, has waived service of citation therein, and has submitted to the court's jurisdiction to try it. *Wright v. Ewens Chevrolet-Pontiac-Buick Co.,* 481 S.W.2d 447, 448 (Tex. Civ. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.).

"If a father's attorney ad litem appears at a termination proceeding, announces 'not ready,' but participates in the hearing by seeking the court's consideration of the child's best interest or otherwise, the father makes a general appearance and waives any complaint about service." *In re K.A.M.,* No. 04-16-00093-CV, 2016 WL 4013786, at *2 (Tex. App.—San Antonio Jul. 27, 2016, no pet.) (mem. op.); *In re Z.B.,* No. 07-16-00026-CV, 2016 WL 3922936, at *2 (Tex. App.—Amarillo Jul. 12, 2016, no pet.) (mem. op.) (once father appeared at final hearing and was represented by counsel, he had made a general appearance).

In this case, Andy and Jim's attorney actively participated and sought affirmative relief from the trial court on several occasions. He presented an opening statement and a closing argument in which he asked the jury to not terminate the parental rights of Andy and Jim, specifically requesting that the jury send the case back to the Department and make the fathers work to solve the family problem.

During the Department's opening statement, counsel for Andy and Jim objected to the Department's definition of clear and convincing evidence. Their attorney joined in

an objection to the introduction of a Department treatise, pointing out that testimony about its contents could be elicited in other ways. During cross-examination, counsel for Andy and Jim objected to a witness's response as non-responsive and requested to take the witness on voir dire. The attorney conducted cross-examination of most witnesses and put Andy on the stand to testify. He also weighed in on a dispute regarding whether a particular party should be included in the jury charge or only in the final order and provided an objection to the trial court's initial response to the note from the jury, and later waived that objection after the judge corrected the response to the note.

It is clear that, by their attorney's activities, Andy and Jim entered a general appearance at trial and therefore waived any issues with regard to service and personal jurisdiction. Andy and Jim invoked the judgment of the court on the question of termination of their parental rights and sought affirmative action in the form of objections, putting on witnesses and evidence, and asking that the jury not terminate his clients' parental rights. We overrule Andy and Jim's first issue.

In Jim's second issue, he asserts that the evidence is insufficient to support the jury's finding that termination is in the children's best interest. Jim does not specify whether he is challenging the legal or factual sufficiency of the evidence or both, so we will assume that he is challenging both.

To preserve for appellate review a legal sufficiency complaint in a termination case tried to a jury, a party must make that complaint in the trial court by: (1) a motion for new trial; (2) a motion for an instructed verdict; (3) an objection to the submission of a question in the jury charge; (4) a motion for a judgment notwithstanding the verdict; or

(5) a motion to disregard the jury's answer to a question in the verdict. *In re H.D.B.-M.*, No. 10-12-00423-CV, 2013 WL 765699, at *8-9 (Tex. App.—Waco Feb. 28, 2013, pet. denied) (mem. op.). And to preserve for appellate review a factual sufficiency complaint in a termination case tried to a jury, a party must include that complaint in a motion for new trial. *A.M.*, 385 S.W.3d at 78-79. Because Jim failed to preserve either a legal or factual sufficiency complaint, we overrule his second issue.

Having overruled all of appellants' issues, we affirm the trial court's order of termination.


REX D. DAVIS
Justice

Before Chief Justice Gray,
          Justice Davis, and
          Justice Scoggins
Affirmed
Opinion delivered and filed November 16, 2016
[CV06]

